UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION

In Re                          *    Case No. 10-51328(AHWS)
                               *
     TIFFANY M. KRITHARAKIS,   *    Bridgeport, Connecticut
                               *    June 21, 2011
          Debtor.             *
                               *
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE ALAN H.W. SHIFF
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtor:              LINDA M. TIRELLI, ESQ.
                             Law Offices of Linda M. Tirelli
                             The Gateway Building
                             1 North Lexington Avenue, 11th fl.
                             White Plains, NY  10601

For the U.S. Trustee:        HOLLEY L. CLAIBORN, ESQ.
                             Office of the United States Trustee
                             The Giaimo Federal Building
                             150 Court Street, Room 302
                             New Haven, CT  06510

For Deutsche Bank            MARTHA CROOG, ESQ.
 National Trust Co.:         JONATHAN KAPLAN, ESQ.
                             The Brownstone
                             190 Trumbull Street, 2nd floor
                             Hartford, CT 06103

                             THOMAS A. CONNOP, ESQ.
                             Locke, Lord Bissell & Liddell, LLP
                             2200 Rose Avenue, Suite 2200
                             Dallas, TX  75201

Court Recorder:              MS. SUJATA RAI

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

1          (Proceedings commenced at 2:15 p.m.)

2               THE CLERK:  Tiffany Kritharakis.

3               MS. TIRELLI:  Good afternoon, Your Honor.

4               THE COURT: I'll take the appearances.

5               MS. TIRELLI:  Linda Tirelli on behalf of the

6     debtor, Tiffany Kritharakis.

7               MS. CLAIBORN:  Good afternoon, Your Honor. Holly

8     Claiborn for the U.S. Trustee.

9               MR. KAPLAN:  Jonathan Kaplan on behalf of Deutsche

10    Bank, trustee.

11              MR. CONNOP:  Good afternoon, Your Honor.  Thomas

12    Connop, also on behalf of Deutsche Bank as trustee.

13              MS. CROOG:  And Martha Croog on behalf of Deutsche

14    Bank trustee as well, Your Honor.  Good afternoon.

15              THE COURT:  Good afternoon.

16              MS. TIRELLI:  Your Honor, I'm sorry.  Just to be

17    clear, is anybody here today on behalf of American Home

18    Mortgage Servicing?

19              THE COURT:  I didn't hear anybody say they were.

20              MS. TIRELLI:  Okay.  Thank you, Your Honor.

21              MR. CONNOP:  Your Honor, I should clarify.  We're

22    appearing on behalf of American Home, who has also filed a

23    motion for a protective order based upon a subpoena served

24    upon AMSI in Dallas, Texas.  So I should clarify.  Thank

25    you, Your Honor.

1          THE COURT:  All right.  This is another hearing

2    involving discovery and protective orders and this adversary

3    -- or this contested matter has been the subject of several.

4          The creditor is objecting to the request for a

5    protective order.  Am I correct?

6          MR. CONNOP:  We're moving for a protective order,

7    Your Honor.

8          THE COURT:  You're moving for a protective order.

9    And at the last hearing -- I'm just reviewing my notes --

10   there was a hearing on May 3.  So I want the record to be --

11   pick up where we left off.

12         The note I have is that the debtor did not follow

13   the court's directive; that is, file a list of document

14   requests but not produced.

15         Instead the debtor filed a Rule 30(b)(6) with a

16   request that -- with a request to produce documents.  That

17   was docket no. 82 and 85 was the bank's objection.

18         I'm disinclined to continue to have discovery

19   hearings on this.  I want this matter to go to trial, but

20   it's frustrated -- that effort is frustrated by this

21   discovery problem.

22         I thought I made it very clear last time,

23   notwithstanding anything else that had been done, just so

24   the Court would be able to get the basis for the claim and

25   the objection to the claim, I required the debtor to prepare

4

1    a document and I put it in the format of columns A, B, and

2    C.  That's what I ordered Attorney Tirelli to do.

3         Attorney Tirelli did not do that.  Attorney

4    Tirelli decided to do it another way.  And she filed a

5    document that it was entered on June 3rd, which starts with

6    debtor's statement of claims, list of witnesses and

7    exhibits, and production requests.  At least that's the last

8    thing I've got.

9         So what I want the bank to tell me is, what's the

10   basis for your motion for a protective order, just to get

11   that back on the record.

12        MR. CONNOP:  Thank you.  Excuse me, Your Honor.

13   The volume is not too loud.

14        This case is an interesting posture.  When we

15   stepped in the hall on May --

16        THE COURT:  Sit down, Ms. Tirelli.

17        MR. CONNOP:  -- on May 3rd following Your Honor's

18   admonition to prepare the document that Ms. Tirelli did in

19   fact file, we were approached by Ms. Claiborn who asked if

20   our position had changed or modified in any respect because

21   the debtor's house had burned to the ground on March 28th.

22   It was the first time we'd heard about this.

23        So I do think it's worth inquiring of the debtor's

24   counsel why we are here, because there's no house.

25        THE COURT:  Why is the house the issue?  She

1    claims that the paper was forged.  She's claiming --

2          MR. CONNOP:  No, she doesn't claim the paper was

3    forged; the paper itself.  She's not denying that she signed

4    a note.  She's not denying that she signed a mortgage.

5          THE COURT:  Well, I'll let her speak for herself

6    then.  My sense is she thought there was a forged signature

7    and that all you  produced was a document that couldn't

8    verify the signature.  But I'll let her speak for herself.

9          MR. CONNOP:  No, I don't think the issue, at least

10   as it has been articulated as we understand the objection to

11   be on of forgery.  She is contending, I believe, the

12   documents were executed after the fact and in some fashion

13   thereby created perfection of liens that was in some fashion

14   improper.

15         We take the position that we have the original

16   note in our possession.  We have the original alonges in our

17   possession.  The mortgage was recorded.

18         And while the debtor may be entitled to

19   information relating to the mortgage arrearage in order to

20   cure, issues relating to the perfection of the lien are

21   obvious.  It was reported in the --

22         THE COURT:  They're obvious to you.

23         MR. CONNOP:  Well, Your Honor, it was recorded

24   with the Norwalk City records.

25         THE COURT:  It is being contested whether you were

1    happy about it, sad about it, think it's justified or not.

2    They're contesting it and I've got to make a decision about

3    it.  You keep on blowing through that thing and saying, we

4    were right and we can prove we're right, and there's no

5    question about we're right, and why is anybody challenging

6    that we're right.  So we're not going to do it that way.

7         What I wanted to do is find out what was holding

8    up the trial.  And now you bring up this question about the

9    house being burned down, and the house was the subject of

10   the claim, I believe.  Is that right?

11        MR. CONNOP:  Right now it's going to be an issue

12   of insurance proceeds, Your Honor.  Insurance proceeds that

13   will be jointly payable, presumably to the Kritharakis's and

14   to my client.

15        THE COURT:  I believe the debtor is taking the

16   position that your client isn't entitled to anything because

17   you're --

18        MR. CONNOP:  If we're --

19        THE COURT:  Because your paper is no good.

20        MR. CONNOP:  If we're the joint payee on the

21   insurance policy --

22        THE COURT:  That may be the insurance company's

23   position.  They don't make the law either.  I think her

24   position is that -- but again, I'll let her speak for

25   herself.

7

1          So far I've gotten the sense that Ms. Tirelli

2     thinks that there was some misbehavior and that their paper

3     is not good and you can't use that paper as a basis for

4     asserting an interest.  I think that's what she's saying.

5     But I'll let her tell me why.

6          But that still doesn't get me to where I was

7     because where we were last time, I directed Ms. Tirelli to

8     divide into three parts her response to these questions; her

9     argument in support of her objection to the claim of the

10     bank, the second was the documents and witnesses that will

11     support the argument and why.

12          The third column, whether the debtor has received

13     the documents that she needs in the second column.  So those

14     three were what I asked for and I didn't get them.  I don't

15     suppose anybody else did either.

16          MR. CONNOP:  No, Your Honor.  I would point out

17     that in counsel's pleading she listed the exhibits that she

18     intended to introduce in support of her objection.

19          THE COURT:  What are you looking at, because I

20     didn't get anything that remotely looks like what I

21     required.

22          MR. CONNOP:  Well, I don't want to say it's

23     necessarily what the Court wanted, but there is, at page

24     five of her document, a list of exhibits.

25          THE COURT:  Well, I --

1          MR. CONNOP:  It's in Roman numeral three.

2          THE COURT:  Then you're looking at something I

3    don't have.  I don't have numbered pages of anything.

4          MR. CONNOP:  I'm sorry.  This is the debtor's

5    statement of claims, list of witnesses, and exhibits and

6    production requests.  What I have --

7          THE COURT:  Oh, I see.  There is a number.  Okay.

8    I'll look at your page.  I'll look at your page.

9          MR. CONNOP:  Could I just finish that thought,

10   Your Honor?

11         THE COURT:  Sure.

12         MR. CONNOP:  She has identified certain exhibits

13   that she intends to use.  And she has every one of these

14   documents.  She has the pooling and  servicing agreement.

15   We produced it after our last hearing.  We also produced the

16   schedule of loans redacted to show that the loan was

17   transferred.

18         THE COURT:  You're way by me now.  We're talking

19   past each other.

20         MR. CONNOP:  Okay.

21         THE COURT:  I required an order from the bench

22   telling Ms. Tirelli what she had to do.  This doesn't do

23   that.

24         MR. CONNOP:  Right.

25         THE COURT:  I'm not going to go weed through 17

1   pages of material that doesn't satisfy my order.

2          There is no basis for Ms. Tirelli not filing what

3   I asked for.  What she has filed was entirely different.  It

4   may -- if I look hard enough through this, if I find a basis

5   for lining up the information I wanted, the Court isn't

6   going to do that.

7          Now, Ms. Tirelli, I need to have from you an

8   explanation for why you disobeyed my order.

9          MS. TIRELLI:  Your Honor, I did not -- I don't

10   feel I disobeyed the order.

11          In fact as I recall, I specifically asked Your

12   Honor if you wanted columns, and I thought that Your Honor

13   had said -- I don't have the transcript in front of me.  But

14   it wasn't the columns you were concerned with.  What you

15   were concerned with is that I give you a concise statement

16   of what we're claiming.

17          And that I did.  I set it down into four very

18   simple paragraphs of what we're claiming.  I provided the

19   Court with a list of exhibits.  I provided Your Honor with a

20   list of witnesses.

21          And then I believe that opposing counsel did chime

22   in and said that they wanted to know which documents I

23   wanted and specifically why we wanted each document.

24          And so, Your Honor, I gave a list of each

25   request --

1                    THE COURT:  All right.  Let's start --

2                    MS. TIRELLI:  -- followed by a reason for the

3       request.

4                    THE COURT:  Let's start with what I asked for.  I

5       said make a statement which will set out your argument in

6       support of your objection to the bank's proof of claim.  Now

7       you're saying statement of claims is what that is?

8                    MS. TIRELLI:  Yes, Your Honor.  Without having to

9       rewrite my entire objection, which I didn't want to do

10      because I know that Your Honor wanted it concise.  So what I

11      did was I went back to my objection and I made it more

12      concise.  And that's literally what I did.  I separated it

13      into four claims.

14                   THE COURT:  May I interrupt you for a moment,

15      please, and so we can get back to what I was asking?

16                   MS. TIRELLI:  I'm sorry, Your Honor.

17                   THE COURT:  Thank you.  The first thing I asked

18      for was your argument in support of your proof of claim.

19      Where in these 17 pages am I supposed to be looking to find

20      that?

21                   MS. TIRELLI:  My objection to the proof of claim.

22                   THE COURT:  Madam.

23                   MS. TIRELLI:  I'm --

24                   THE COURT:  I'm looking at what you -- your

25      objection to claim isn't this.

1          MS. TIRELLI:  Correct, Your Honor.

2          THE COURT:  Where in this piece of paper that you

3     filed in response to my order -- and next time come with a

4     transcript -- requires you to tell me what each argument

5     you're making in support of your proof of claim.

6          Now I'm asking you to look at those 17 pages and

7     tell me where you satisfied that.

8          MS. TIRELLI:  Your Honor, Roman numeral one --

9          THE COURT:  Okay.

10         MS. TIRELLI:  -- the first thing that the debtor

11    is claiming is fraud on the Court on the part of --

12         THE COURT:  Okay.

13         MS. TIRELLI:  -- the claimant.

14         THE COURT:  I'll look at number one as the first

15    thing I asked for.  Anything else?  Claim number two.  Okay.

16         MS. TIRELLI:  Number two.

17         THE COURT:  Okay.

18         MS. TIRELLI:  The proof of claim does not --

19         THE COURT:  Okay.

20         MS. TIRELLI:  -- prove a perfected security

21    interest in the debtor's property.

22         THE COURT:  All right.

23         MS. TIRELLI:  Deutsche Bank did not have standing

24    to file a proof of claim.

25         THE COURT:  Okay.

1          MS. TIRELLI:  And number four.

2          THE COURT:  Okay.

3          MS. TIRELLI:  The accounting of claim is

4     incorrect; includes misapplication of funds, improper use of

5     suspense accounts, and includes sharing/splitting of fees.

6          THE COURT:  Okay.  Now, the second thing you were

7     required to do, and I assume those four exhaust your entire

8     list -- your entire argument in support of your objection to

9     their proof of claim.

10         MS. TIRELLI:  Correct, Your Honor.

11         THE COURT:  All right.  Now we'll go to the second

12    thing I asked you for, to itemize the documents and

13    witnesses that will support the argument and why.  Where

14    does that show up in your 17 pages?

15         MS. TIRELLI:  Well, within each one of those four

16    arguments I referenced, based on the list of witnesses and

17    exhibits to follow, I gave Your Honor a list of witnesses.

18    The witnesses and exhibits -- a lot of these claims are sort

19    of intertwined.

20         And what I gave Your Honor was a list of

21    witnesses, what I would expect them to testify to, and then

22    a list of the exhibits that we have to date.

23         And then furthermore I gave Your Honor -- well,

24    that should answer Your Honor's question.  I don't want to

25    go any further.

1          THE COURT:  All right.  So if I look at Roman two,

2     list of witnesses and exhibits, that will satisfy the second

3     thing.  So I'll put a B on paragraph two.

4          And that goes to -- and I'll put a B on Roman

5     three, because that's a list of exhibits.  See, I'm doing

6     this in the same format that I directed, but I'll see how

7     this works out.  So --

8          MS. TIRELLI:  And, Your Honor, those would be --

9          THE COURT:  So that with documents and witnesses

10    that will support the argument and why, you direct my

11    attention to Roman two and Roman three.

12         MS. TIRELLI:  As well as one because one will

13    explain the claim and what is --

14         THE COURT:  No, one is what your argument is.

15         MS. TIRELLI:  Okay.

16         THE COURT:  Two is the documents and witnesses

17    that will support the argument.

18         MS. TIRELLI:  Yes, Your Honor.

19         THE COURT:  All right.  So that takes care of

20    number one, which is A on my order, and B -- and two, which

21    is number B in my order.  That gets us down to the third

22    thing I asked you for.  And the third thing I asked you for

23    was whether the debtor has received the requested documents

24    that are enumerated in B or two. And I'm supposed to be

25    looking now at your Roman four?

1          MS. TIRELLI:  Roman four, Your Honor -- Roman

2     three are the documents that we have.  Roman four is the

3     documents that we were requesting that we do not yet have.

4          THE COURT:  Well --

5          MS. TIRELLI:  And I gave a reason for each one of

6     those outfits that we've not yet received, for why I need

7     it.

8          THE COURT:  Okay.  So --

9          MS. TIRELLI:  And I apologize this is not --

10         THE COURT:  Then what you're telling me is if I

11    start with Roman four, that will give me a response to the

12    order whether the debtor has received the documents.

13         MS. TIRELLI:  I believe so, Your Honor.  Yes.

14    Those are the documents I have not received.

15         THE COURT:  Well, take all your time.

16         MS. TIRELLI:  Yes.

17         THE COURT:  Is that it or not?  Okay.  So that's

18    C.  So that's number four.  Okay.

19         So if I go to your Roman four, which seems to be

20    the issue that's left for today, as the documents that you

21    say you need to prove -- the documents that you identify in

22    Roman two but don't have, that's the place that it seems I

23    should look.

24         MS. TIRELLI:  I believe that we should start with

25    Roman numeral four, Your Honor.  I would agree with that.

1          THE COURT:  Okay.  Good.  That starts on page six

2     of 17.  Now the thrust of your claim is that the paper that

3     would make them a holder of an interest, a security

4     interest, was defective.  So far is that correct or not

5     correct?

6          MS. TIRELLI:  Not 100 percent, Your Honor.  I want

7     to make sure --

8          THE COURT:  All right.  Well, what percentage were

9     we --

10          MS. TIRELLI:  Well, okay.  I'd like Your Honor to

11     follow along.  The proof of claim that was filed was

12     deficient.  It did not show any connection whatsoever

13     between the claimant and the loan.  I filed an objection and

14     then there was a subsequent amendment to the proof of claim

15     that was filed.

16          Some of the documents that were submitted to this

17     court by the claimant are false documents.  They're bogus.

18          THE COURT:  All right.  So you got them.  They're

19     bogus.  You could try to prove they're bogus.  They're going

20     to try to prove that they're legitimate.  That's not our

21     problem today.

22          The problem today is, is there something that you

23     don't have, which you're entitled to get, and you're

24     entitled to get it because it is within the scope of the

25     list of witnesses and exhibits which you are supposed to

1    advise me about, which you claim you did in Roman two of

2    your submission?

3            You were supposed to give me a list of the

4    documents and witnesses that will support.  And the next

5    item was whether you have received them.  That gets us to

6    number -- Roman four.

7            Now you could ask for something and you could say

8    I need a document.  I'm asking for it because I need a

9    document to prove my position.  But if you're asking for

10   something that has no relevance, then the protective order

11   that they're seeking should be granted.

12           Now going to -- let me see.  I don't believe there

13   are.  There are 28 such requests and we could go through

14   these.  All documents relating to or referring to the

15   history of and the precise present whereabouts of the exact

16   original promissory note and the mortgage from the date of

17   the original to the present --

18           MS. TIRELLI:  Your Honor, this is a securitized

19   trust making a claim here.  It's governed by a pooling and

20   servicing agreement.  That pooling and  servicing agreement

21   mandates a very specific order of transfers.  And that order

22   transfers is not evident in the documents that have been

23   provided.

24           THE COURT:  When was the -- there's no question

25   that your client sought and got funds from the banks, right?

1          MS. TIRELLI:  My client signed a mortgage and a

2     note with MAC Mortgage.

3          THE COURT:  Did she get any money?

4          MS. TIRELLI:  And she got money.  She purchased a

5     home.

6          THE COURT:  How much money did she get?

7          MS. TIRELLI:  I believe it was -- I want to say

8     $275,000.

9          THE COURT:  So over $200,000.

10         MS. TIRELLI:  It's over $200,000.  I'm not --

11         THE COURT:  So she got the money.

12         MS. TIRELLI:  I don't have the exact number with

13     me.  I'm sorry.

14         THE COURT:  She paid that debt?

15         MS. TIRELLI:  She was paying on that debt.  Yes,

16     she was.

17         THE COURT:  Was there a balance when she filed

18     bankruptcy?

19         MS. TIRELLI:  We believe so.  It's a matter of who

20     she owes the money to.

21         THE COURT:  Oh, so you're willing to put the money

22     that she agrees she owes into some escrow account and we'll

23     figure out who gets it?

24         MS. TIRELLI:  Absolutely, Your Honor.

25         THE COURT:  Okay.  But I thought I had heard you

1    say before she doesn't really owe these people, Deutsche

2    Bank and American Home because the paper is faulty.

3            MS. TIRELLI:  Well, that's right, Your Honor.

4    They've not proven their chain of transfers.  The Deutsche

5    Bank, as a trustee of this particular trust, cannot own this

6    loan.  Under the terms of the pooling and servicing

7    agreement it must acquire loans under a very specific set of

8    transfers.

9            THE COURT:  So who --

10           MS. TIRELLI:  It cannot acquire it in any other

11   way.

12           THE COURT:  So who would you owe the money to?

13           MS. TIRELLI:  Your Honor, that's what we're here

14   to try to figure out.

15           THE COURT:  No, I don't have to figure anything

16   out.  Who do you say you owe the money -- you say you don't

17   owe it to them.  Who do you owe the money to?

18           MS. TIRELLI:  Well, Your Honor, I would say it

19   would have to go, at this point, to the originator, which

20   would be MAC.

21           THE COURT:  Do you --

22           MS. TIRELLI:  That's the only party that seems to

23   have a real claim here.

24           THE COURT:  And why is it -- if MAC says, we're

25   not looking for it; we're satisfied with what we did with

1   Deutsche Bank or American Home, are you going to say you're

2   required to take this money?  Is that what you're saying?

3          MS. TIRELLI:  Your Honor, I want my client to pay

4   the proper party; the party that is owed the money.

5          THE COURT:  And if the party you think is owed the

6   money says  we are -- you're wrong, we are not owed the

7   money.  Actually the people that are owed the money are our

8   successors, are you going to take the position well, AMC or

9   MAC, whatever --

10         MS. TIRELLI:  Well, Your Honor, it has to be

11   proven.  We don't know who she owes the money to because of

12   the chain of transfers is just --

13         THE COURT:  So you're saying the only person who

14   can get it -- what's the name of this organization?

15         MS. TIRELLI:  It's MAC --

16         THE COURT:  Okay.  MAC.

17         MS. TIRELLI:  I'm sorry.

18         THE COURT:  We'll just shorten it down to MAC.

19         MS. TIRELLI:  We'll shorten it to MAC.

20         THE COURT:  So you're saying MAC gets the money,

21   and MAC says, no, we do not get the money, you're going to

22   say, oh, yes, you do?  Is that your position?

23         MS. TIRELLI:  It's not that that's my position,

24   Your Honor.  My position is that my client should be paying

25   the party that she properly owes the money to.

1          THE COURT:  Okay.  So --

2          MS. TIRELLI:  All right.  And at this point the

3 documents all point to MAC.  I'm not saying these documents

4 lead anywhere else.

5          THE COURT:  But it's not a farthing out of your

6 client's pocketbook, because that money is going to go

7 somewhere, right?

8          MS. TIRELLI:  That's right, Your Honor.

9          THE COURT:  So you want to have all of this

10 discovery, which is not a bad thing for you as the charging

11 attorney, all of this money, all of this trial time, it

12 isn't going to benefit your client one bit because the money

13 is going to go in one direction or another.

14          And this Court should take the time because you're

15 arguing that the people you think are owed the money aren't

16 really owed the money.  Why should this Court get involved

17 in that?

18          MS. TIRELLI:  Your Honor, it's an issue of

19 standing.  I'm arguing that Deutsche Bank does not have

20 standing to collect these funds.  They put a claim into this

21 court.  They've submitted false documents to this Court, and

22 they just simply lack standing.  They must have standing to

23 come to this Court and make a claim.  If my client owes the

24 money, is not the issue.

25          THE COURT:  Do you think that this Court is going

1    to take five minutes for a trial that isn't going to be of

2    any benefit to this debtor?

3              MS. TIRELLI:  Your Honor, my client should be

4    paying the party that has standing and has proper -- and has

5    a proper claim.

6              THE COURT:  Well, you know what I want you to do?

7    I want you to repeat that one more time.

8              MS. TIRELLI:  My client should be paying the party

9    that is properly owed the money.

10             THE COURT:  Thank you.

11             MS. TIRELLI:  And the party that has standing.

12             THE COURT:  Okay.  Thank you.  Now I'm not going

13   to ask you to say that any more times because you've said it

14   several times now.  I remember every one of those words.

15             The issue now is your client owes money, she

16   hasn't paid the money, and the concern you have is, who

17   should we pay?  And I should take the time of a trial to

18   figure out who you should pay.  Why don't we subpoena MAC to

19   come in here and say, are you owed the money?  No.  Why not?

20   Or why?  Why should I have this trial to figure out this

21   chain when you concede that you owe the money and it's just

22   a question of to whom?

23             The debt isn't going to go away.  Your client

24   doesn't get the money for nothing.  The money is being

25   eroded by this process.  That's not a result that this Court

1    should permit.

2           To go through 18 paragraphs of requests so that

3    you could follow the dots that you don't have any pecuniary

4    interest -- talk about standing.  Standing is how were you

5    aggrieved?  How was your client aggrieved?  Your client does

6    not have standing -- a penny from directing the money to go

7    in one direction or another.

8           MS. TIRELLI:  Well, actually, Your Honor, if we do

9    pay the wrong party potentially the correct party is out

10   there and could bring a claim.

11          THE COURT:  Well, they why don't you put down

12   MAC's name on the check, put Deutsche Bank's name on the

13   check, put American Home on the check, and let them fight it

14   out as to who gets the money?

15          MS. TIRELLI:  Your Honor, a claim was filed by a

16   party that lacks standing.

17          THE COURT:  Now if you say --

18          MS. TIRELLI:  That's our argument.

19          THE COURT:  -- that to me one more time I'm going

20   to sanction you.  That can't be any more clear, right?  I

21   understand that.  Do you understand what I'm telling you?

22          MS. TIRELLI:  I do, Your Honor.  I understand.

23          THE COURT:  The banks are taking the position that

24   they got a win.  They got a piece of paper that says they

25   got a win.  What's the matter with finding out what the

1    amount of the money is, put all three names, if you've got

2    good paper from MAC or -- who did you get the paper from?

3              MR. CONNOP:  Your Honor --

4              THE COURT:  A simple question; simple answer.

5              MR. CONNOP:  Sand Canyon.

6              THE COURT:  Who?

7              MR. CONNOP:  A company called Sand Canyon, which

8    is formerly known as Option One Mortgage.

9              THE COURT:  And who did they get it from?

10              MR. CONNOP:  MAC.

11              THE COURT:  Okay.  MAC gets it from San, S-A-N?

12              MR. CONNOP:  Sand.

13              THE COURT:  Sand Canyon.  Okay.  I got it.

14              MR. CONNOP:  It goes MAC to Sand Canyon to

15    Deutsche Bank.

16              THE COURT:  To Deutsche Bank.  And where does

17    American Home fit into this?

18              MR. CONNOP:  We're the mortgage servicer.

19              THE COURT:  So they don't really get the money,

20    they just get --

21              MR. CONNOP:  They don't get the money.

22              THE COURT:  -- a piece of it.  So the money goes -

23    - whatever that money is, and that's another thing we'll

24    figure out.

25              MR. CONNOP:  Right.

1          MS. TIRELLI:  Your Honor, if I may?

2          THE COURT:  Sit down.  You may not.  But you will

3    in a moment.

4          So if we figure out where the money goes, if you

5    got -- if MAC got the money, your position would be, wait a

6    minute; we got it from you and we're the ones that get it.

7          MR. CONNOP:  Yes, Your Honor.

8          THE COURT:  All right.  So if the money had both

9    names on it, MAC and Deutsche Bank, then there's no need for

10   a trial here, so the debtor will simply have to pay whoever

11   succeeds.

12         MR. CONNOP:  That's fine with us, Your Honor.  We

13   think that would be an appropriate way to resolve it.

14         THE COURT:  Go ahead.

15         MS. TIRELLI:  Your Honor, according to the pooling

16   and servicing agreement, this loan had to transfer from MAC

17   to Option One to Greenwich Capital, to Financial Asset

18   Servicing Corp., to Soundview Trust, 2005.  This trustee

19   cannot acquire this loan any other way.

20         THE COURT:  You are determined to litigate, aren't

21   you?

22         MS. TIRELLI:  It's not that I'm determined to

23   litigate, Your Honor.  I'm determined to -- well, I don't

24   want to use the term you asked me not to use, but this --

25         THE COURT:  Look, your client can't keep the

1    money.  It's a windfall to your client.  Your client has the

2    money in her pocketbook.  That bond money doesn't belong

3    there.  The people who have a right to it have a right to

4    claim the money.  Your client doesn't.

5          It's just a question of how much money they're

6    talking about and getting that money into a place, a

7    depository, so that the people who are fighting over it will

8    get it.  It is not a bankruptcy issue anymore.

9          MS. TIRELLI:  I'm sorry.  Your Honor, are you

10   speaking about the insurance proceeds for the house?

11         THE COURT:  Well, if the money --

12         MS. TIRELLI:  Or --

13         THE COURT:  -- that your client owes has -- I just

14   heard for the first time about the property being burned.

15         The value of that -- I gather there's a house with

16   a mortgage on it and now there's no more house anymore.

17   Instead of a house there's a bag of money.

18         The loan papers say that that bag of money has a

19   security interest on it.  Whatever that security interest on

20   it is goes to the people who have a allowed security

21   interest.  That's my issue.

22         If it goes to both parties and both of them agree

23   that it goes one way or the other and it gives your client a

24   release, which you would have to do of course.  Right?

25         MR. CONNOP:  Yes, Your Honor.

1          THE COURT:  Then this is no longer a bankruptcy

2     question.  So that's the way I think this should go on.

3          We could litigate this forever, which would

4     probably be a good thing for fees.  But this is not

5     something that this Court needs to use its time.

6          I don't think you have any standing to do anything

7     more than to -- since you have admitted you have to pay the

8     money to somebody, you were not -- the standing argument

9     you're using is working against you.  You don't have a

10    financial interest in it.  You're not economically

11    aggrieved.  So --

12          MS. TIRELLI:  Your Honor, the issue of the

13    documents that were submitted to this Court not being what

14    they purport to be, is that of any concern to this Court?

15          THE COURT:  Not because -- the reason why not is

16    because you're going to get a release.  And the money isn't

17    going to come into the estate.  It isn't going to go to

18    payoff -- unsecured creditors.

19          This is a security interest which may be equal to

20    the amount of the insurance proceeds.  It may be an amount

21    that is less than the insurance proceeds, in which case the

22    estate will have a right to the balance of it.

23          Is it this a -- what chapter are we in here?

24          MS. TIRELLI:  Chapter 13, Your Honor.

25          THE COURT:  Chapter 13.  Then a Chapter 13 estate

1    will have an asset consisting of the net amount and this

2    will no longer be a claim.  The claim will be fought out.

3          But for me to go through to find out the trail of

4    the paper may be an interesting academic adventure.  It may

5    have standing in a court where there is criminal activity

6    and forgeries.  But this isn't a court that conducts

7    criminal trials.

8          And if you believe somebody has committed such

9    crimes, the place to go is to the U.S. Attorney's office,

10   and perhaps you can get some interest there.

11         This Chapter 13 estate owes money.  You conceded

12   it owes money.  The only issue is where the money goes.

13         MS. TIRELLI:  Well, Your Honor, it's also an issue

14   of how much money.  The accounting is also at issue.

15         THE COURT:  Okay.  Let's go to issue number two.

16   How much -- I asked you before.  You didn't know how much

17   the loan was.  You said it was -- where am I here?

18         MS. TIRELLI:  I don't recall off the top of my

19   head, Your Honor, the amount of the loan.  I'm sorry.

20         THE COURT:  Well --

21         MR. CONNOP:  $340,000.

22         MS. CROOG:  $340,000.

23         MS. TIRELLI:  $340,000.  Sorry.

24         THE COURT:  $340,000.

25         MS. CROOG:  I think it was about $336,000 at the

1    beginning of this case, Your Honor.

2              THE COURT:  And the property was -- there was

3    equity in the property so interest ran.  Am I correct or not

4    correct?

5              MR. CONNOP:  We hadn't gotten to the point of an

6    appraisal or a motion for relief from stay.  I don't think

7    there was equity in the property but that would be pure --

8              THE COURT:  Well, if there wasn't, then interest

9    didn't run.

10             MR. CONNOP:  Exactly.

11             MS. TIRELLI:  There was no equity in the property,

12   Your Honor.

13             THE COURT:  There was none?

14             MS. TIRELLI:  There's actually a second lien on

15   the property.

16             THE COURT:  That doesn't mean there was no

17   equity --

18             MS. TIRELLI:  That would be for --

19             THE COURT:  -- for the first lien holder.

20             MS. TIRELLI:  No, there's some equity for the

21   first lien holder but I don't think it's entirely secured.

22             THE COURT:  And they say no.  And they think not.

23   Whatever that number is -- let's say that this number is 340

24   and that number holds up because there was equity in the

25   property, how much was paid?

1          MS. TIRELLI:  I'm sorry, Your Honor?

2          THE COURT:  How much did your client pay?

3          MS. TIRELLI:  Your Honor, I haven't gotten to that

4     point yet.

5          THE COURT:  Well, you're at it now.

6          MS. TIRELLI:  Okay.  Well, Your Honor, part of the

7     discovery is I'd like to have a life of the loan transaction

8     history.  There were two different --

9          THE COURT:  Your client ought to be able to tell

10    you without discovery from them, what she paid them.

11         MS. TIRELLI:  Well, Your Honor, correct.  But it's

12    a matter of what they're saying is owed.  There's a lot of

13    fees and charges that have been added on to this account.

14         The accounting that was presented in this

15    bankruptcy court is different from the accounting that was

16    presented in the state court, and there's only two months

17    between the two filings.

18         There was an affidavit of debt that was submitted

19    by a third party who works for a company, LPS, which

20    indicates that there's been some tampering, or at least

21    access by a third party to American Home Mortgage Servicing

22    Incorporated's files and records and accounting.  We need to

23    get a full transaction history report to determine exactly

24    what does she owe, what's been paid, and where has this

25    money gone.

1          To the extent that there has been fee sharing and

2     fee splitting amongst the parties, Your Honor, that's

3     something that we should be having a credit for and that

4     perhaps the Court might be interested in.

5          THE COURT:  What I'm interested in is to have

6     allowed claims paid to the people who are the holder of

7     those allowed claims, and creditors getting paid as much as

8     possible.  That's what Chapter 13 does in exchange for being

9     able to save a home.

10          That has been changed a little bit now because

11     there's no home to save.  So why this is in Chapter 13 is a

12     question that has just come before us.

13          MS. TIRELLI:  Your Honor, the fire happened after

14     she filed bankruptcy.  I just want to make sure that --

15          THE COURT:  And now she has no home to save.

16     There is no home.  There is insurance proceeds.

17          MS. TIRELLI:  To rebuild her home so she would

18     have a place to live, yes.

19          THE COURT:  Well, but that is not -- that isn't

20     what Chapter 13 is about.  Theoretically I suppose that it

21     could be to save -- what you're trying to do is save the

22     insurance proceeds.  Chapter 13 generally is to save homes

23     or other kinds of property and not insurance proceeds.

24          The insurance proceeds should be paid to the

25     people who are entitled to the insurance proceeds.  So all

1    we're talking about is how much money.

2         MS. TIRELLI:  Well, Your Honor, I'm sorry.  Have

3    we determined exactly -- I just want to make sure that I'm

4    clear.  The Court believes that the party entitled to the

5    money is multiple parties?  I just --

6         THE COURT:  No, I think that it's something that

7    those parties could -- I don't think it's a bankruptcy issue

8    as to who the parties are.

9         MS. TIRELLI:  Yes.

10        THE COURT:  The issue is -- that is an issue that

11   they could fight out.  It may be that MAC will say, we are

12   entitled to all the proceeds.  Deutsche Bank would then say,

13   oh, that's not so.  You assigned that loan to us.  MAC may

14   say, yes, but the assignment was defective.  Deutsche Bank

15   may say, well, you're the ones that made it defective.

16   That's nothing that the Bankruptcy Court is going to get

17   involved in.

18        The Bankruptcy Court is involved with the

19   administration of a Chapter 13 estate which was created to

20   save this woman's house which doesn't exists.

21        If there is criminal activity, misbehavior, that's

22   for another court to decide.  If there is a contract breach,

23   that is also for another court to decide and that could go

24   to a state court.  This may be a marathon pipeline

25   jurisdiction issue over breach of a contract.  But this

1    Court believes that any contract dispute, if there is one --

2    it sounds to me like this might be a non-core issue before

3    this Court.  But we're nowhere close to that.

4            MS. CLAIBORN:  Your Honor, could I weigh in?

5            The U.S. Trustee has asked this Court for the

6    right to take the 2004 Examination of Deutsche.

7            THE COURT:  For what purpose?

8            MS. CLAIBORN:  Because the U.S. Trustee is

9    concerned about the voracity of the documents that Deutsche

10   has presented as evidence of their right to collect this

11   debt.

12           The U.S. Trustee is concerned about Deutsche's

13   conduct in this case, whether or not the documentation bears

14   out about Deutsche's standing.

15           And that concern is of a systemic basis, Your

16   Honor, because as Your Honor is probably aware, there have

17   been a number of instances across the country where lenders

18   have asserted their rights and have turned out not to

19   actually have standing to assert those rights.

20           And it ultimately imposes problems upon individual

21   debtors and it can impose a very big problem in the system

22   that we need to make sure that there are checks and balances

23   to make sure that people stand up and ask --

24           THE COURT:  If you believe that there was criminal

25   activity --

1          MS. CLAIBORN:  -- for rights.

2          THE COURT:  -- I recommend that you find out who

3     the U.S. Attorney is and address those.  This is not a

4     bankruptcy question.

5          MS. CLAIBORN:  Your Honor, I'm not asking for

6     criminal.  I'm just asking for the right to know as to how

7     we got here.  Deutsche is saying that they own this loan.

8          THE COURT:  Well --

9          MS. CLAIBORN:  That's the information we've been

10     trying to gather.

11          THE COURT:  I don't know that it makes any

12     difference whether they own that loan because it isn't going

13     to effect this bankruptcy estate and this is a bankruptcy

14     court that has jurisdiction over the management of

15     bankruptcy estates.  But this doesn't effect the bankruptcy

16     estate.

17          MS. CLAIBORN:  Your Honor, from the U.S. Trustee's

18     perspective if creditors are filing proofs of claims and

19     they don't have the right to do so, that is something that

20     our office is concerned with and takes very seriously and

21     we're trying to --

22          THE COURT:  The --

23          MS. CLAIBORN:  -- make sure that that didn't

24     happen in this case.

25          THE COURT:  Well, that's a very noble objective

1    and I subscribe 100 percent to it.  So far I don't see it's

2    appropriate in this particular case.

3            There have been cases reported throughout the

4    country where lenders have bad paper and it comes up very

5    often, most often in Chapter 13 settings, where a bank is

6    looking for relief from stay to foreclose.  The debtor or

7    the Court says, show me the paper, and they don't have the

8    paper.  And the Court says, I'm not going to grant you

9    relief from stay.  That's going on all over the place.

10           That isn't where we are in this case.  Where we

11   are in this case is an admission that there is money owed to

12   one or the other, or perhaps both.  The debtor won't

13   benefit.  The estate won't benefit by finding out who that

14   is.  If there is irregularity, it may be irregularity that

15   rises to the level of criminal activity.

16           If there is a contract dispute over it, that is

17   between the parties to the contract or the agreement.  The

18   bankruptcy estate shouldn't be depleted by attorney fees

19   that are going to try to price the money when the estate

20   won't benefit by one penny.

21           Now the U.S. Trustee may have some global issue

22   that it has an interest in, and I understand that the U.S.

23   Trustee's office has the right to look at the integrity of

24   the process and whether or not proofs of claim are filed

25   fraudulently or not.  In this case the proof of claim may be

1    -- the bank may withdraw its proof of claim.  They may say,

2    if the check is made payable to us and to MAC, on the basis

3    that it belongs to one or the other of us, or perhaps a

4    combination of us, then it seems to me that the bankruptcy

5    court should not be getting involved in it, and I think the

6    U.S. Trustee could wait for a better case to challenge the

7    theory that somebody has a proof of claim with potentially

8    defective or questionable paper.

9         This court is too busy to get involved in the

10   intellectual questions as -- when it isn't going to benefit

11   the estate.  The public policy isn't being offended because

12   it surely belongs to either one or the other.  And another

13   thing is for sure, it doesn't belong to the debtor.  The

14   debtor's counsel has admitted that.  The only question is,

15   how much money are we talking about?

16        I'm going to take a 10 minute recess.

17        THE CLERK:  All rise.  Court is in recess.

18    (Recess from 3:00 p.m. until 3:27 p.m.)

19        THE COURT:  All right.  I took a recess.

20        I was discussing the management of this Chapter 13

21   case which has changed its posture to some extent because of

22   the burning of the home, which would have been the principal

23   basis upon which a Chapter 13 was filed in the first place.

24   It was correctly filed and properly filed, but that result

25   has some impact on what happens from here.

1          The question about the discovery -- and this is

2     not the first day of discovery fighting, it's been going on

3     for quite some time at the expense of the estate and at the

4     expense of the creditors who are asking for protection.

5          As this evolves the issue that this Court should

6     address is to advance this Chapter 13 case, if it's going to

7     remain a Chapter 13 case.

8          The issue of the discovery was primarily targeting

9     the debt, which apparently was initiated by Sand Canyon and

10    then went from there and then ultimately is claimed to be

11    held by Deutsche Bank in service by American Home.

12         The amount of the debt is somewhere in the

13    neighborhood -- and this isn't an exact figure because no

14    figure has been given -- but the parties appear to believe

15    that it's around $340,000.

16         The debtor's counsel concedes that there is a

17    security interest held by someone and that some payments

18    were made and we don't know at this stage of the proceedings

19    how much was paid, so how much of a security interest

20    remains.  But the fact that there is a security interest has

21    been conceded.

22         There's also no basis for this Court to conclude

23    the fair market value of the house so that it can be

24    determined whether or not interest continues to run on the

25    debt that is owed to somebody; secured debt that is owed to

1    somebody.

2           Without that information the interest that is

3    added to the original debt, which I think the U.S. Trustee

4    mentioned was somewhere in the neighborhood of 330 some odd

5    thousand dollars, 336, whether or not that interest was

6    proper or not.

7           The bank thinks there's no equity.  The debtor's

8    counsel believes that there was.  The debtor's counsel says

9    there is a second mortgage, but as to the first mortgage

10   interest, which continued to run at the expense of the

11   second mortgage, if there were equity to protect the first

12   mortgage's interest.

13          But the Court does not want to burden the estate

14   with discovery, which is significant discovery, if the

15   estate can't benefit from that discovery.

16          At this point in time, and without prejudice to

17   further development, the concessions made by counsel suggest

18   to the Court that the estate can't benefit.  The claim is

19   owed; the secured claim is owed to either MAC or Deutsche

20   Bank.  Deutsche Bank says it is entirely the right -- that

21   it is the holder of an allowed claim.  MAC hasn't

22   participated in this case, as far as the Court knows, since

23   it's inception.  I'm not sure that MAC has even been listed

24   as a creditor and MAC may not even have notice of this case.

25          So this is what I'm going to do.  The debtor's

38

1   motion for protective order is off without date.  Let's see

2   how this case evolves.

3          U.S. Trustee's -- no, wait, I've got this wrong.

4   The debtor is asking for a protective order with respect to

5   the --

6          MS. TIRELLI:  No, Your Honor.

7          THE COURT:  Let me start again.  The bank,

8   Deutsche Bank, is seeking a protective order from the

9   discovery sought by the debtor.  That's off without date.

10  Now the bank is seeking a protective order with respect to a

11  2004 exam sought by the U.S. Trustee.  That is off without

12  date.

13         I'm going to have a hearing, and I'll give you

14  dates, but the matters that I need to have in advance of

15  that hearing are these; I want the debtor to file an

16  affidavit stating file served, two copies to chambers, copy

17  to the U.S. Trustee's office, and serve Deutsche Bank's

18  counsel.  File a statement of the original debt.

19         In that statement state the amount paid to date.

20  That would mean itemize each payment that the debtor made,

21  the name of the payee, the address of the payee, the amount

22  of the payment and the date of the payment.

23         The third part of the statement will be the amount

24  claimed by the debtor that is outstanding as a result of

25  those payments.  And the fourth will be a statement of the

1    fair market value of the property as of the petition date.

2         This is a residence so a simple appraisal will do.

3    Exchange file and deliver to chambers as I mentioned, with

4    copy to the U.S. Trustee.  The bank will have the right

5    to -- well, let's see.  And there's nothing -- I overlooked

6    the fact that there's no house there.  Rubble.  So we have a

7    box of money.

8         And that check is made payable to whom?  Who is

9    the check payable to?

10        MR. CONNOP:  As I understand it presently, Your

11   Honor, the claim has not been fully adjusted.  It would be

12   made payable, I believe, to the servicer, American Home

13   Mortgage Servicing, and the debtors, Mr. and Mrs.

14   Kritharakis.

15        THE COURT:  You disagree with that?

16        MS. TIRELLI:  I'm not aware of exactly who the

17   payee would be.  I would imagine probably it would be the

18   servicer but, again, this is going back to the issue --

19        THE COURT:  Okay.  So now the question is the

20   value of the property so it could be determined whether or

21   not it was -- Deutsche Bank had an equity position as it

22   says it doesn't or does as the debtor says.

23        MS. TIRELLI:  Well, Your Honor, I did obtain a

24   paid appraisal prior to filing.  And I note that on the

25   creditor's itemization of claim they too had appraisal fees

40

1    of $453.  So they must have already appraised the property.

2              THE COURT:  Okay.  Good.  That will probably be

3    what we have to rely on.

4              MS. CROOG:  But, Your Honor, may I?  We do have a

5    copy of an appraisal that was prepared in connection with

6    the mortgage foreclosure, Your Honor.

7              THE COURT:  Okay.

8              MS. CROOG:  As of approximately one year ago the

9    property was valued at $415,000 with $150,000 attributable

10   to the site and $265,000 attributable to the building.

11             THE COURT:  And your appraisal?

12             MS. TIRELLI:  Your Honor, I didn't bring my

13   appraisal today.

14             THE COURT:  Do you know how much it is?

15             MS. TIRELLI:  I don't recall off the top of my

16   head, Your Honor.  I'm sorry.

17             THE COURT:  Over $340,000?

18             MS. TIRELLI:  I don't recall, Your Honor.  It's in

19   the petition.

20             THE COURT:  All right.  Your statement will also

21   include the amount of the appraisal and -- in text form, and

22   a copy of the appraisal.

23             Has the bank furnished a copy of the appraisal to

24   the debtor?

25             MS. CROOG:  Well, counsel did not have an

1    appearance in the mortgage foreclosure.

2              THE COURT:  Okay.

3              MS. CROOG:  So she was not provided with one.

4              THE COURT:  All right.

5              MS. CROOG:  But the debtors were provided a copy

6    of the appraisal.

7              MR. CONNOP:  And we'll provide her a copy.

8              MS. CROOG:  And we will.

9              THE COURT:  All right.  So then the four matters

10   that will be included in this affidavit I have just outlined

11   and let's see, how much time do you need?

12             MS. TIRELLI:  Well, Your Honor, I don't know that

13   my client -- the house was purchased in 2005.  I don't know

14   if the records were in the house, not in the house.  I don't

15   know if she has the records of all the payments she's ever

16   made, the date, you know, the checks.  I don't know if she's

17   going to have all that information.  So I would have to

18   confer with my client.  So what I'm saying is at least a

19   good --

20             THE COURT:  Did she pay by check?  Or did she --

21             MS. TIRELLI:  She might have done it online, she

22   might have done it on check.  I'd have to check with my

23   client, Your Honor.  2005, I would imagine she paid by

24   check.

25             THE COURT:  Well, it's easy to get it because she

1    ought to be able to get her bank records.

2         MS. TIRELLI:  Well, I understand, Your Honor.  So

3    I'm going to say at least 60 to 90 days to obtain all those

4    records going back to 2005.

5         THE COURT:  Is that when the loan was originated?

6         MR. CONNOP:  Yes, Your Honor.  2000 --

7         THE COURT:  You could get your bank records pretty

8    much -- since they're your client's bank records she's

9    entitled to access her own bank records.  It doesn't take

10   three months to get bank records.

11        MS. TIRELLI:  Well, I know online they typically

12   only go back six months and then there's fees charged beyond

13   that.

14        THE COURT:  Online it's even faster.

15        MS. TIRELLI:  I understand, Your Honor, but online

16   typically it's six months of records and then you have to

17   write to get the rest of them, which --

18        THE COURT:  I think by tomorrow morning you could

19   get that letter out.

20        MS. TIRELLI:  Well, no, Your Honor, absolutely.

21   We're perfectly willing to do it.  I just can't speak for

22   how long it will take a bank to respond and actually get us

23   the records.

24        THE COURT:  Okay.

25        MS. TIRELLI:  I'm saying 60 days.  I don't know.

1          THE COURT:  All right.  Well, then we could

2     subpoena those records if they want to hold it up.  I

3     need --

4          MS. TIRELLI:  I don't think that's going to be

5     necessary, Your Honor.  I really don't.

6          THE COURT:  I think 90 days to get your client on

7     the assumption that your client's records were burned up in

8     the house, your client should then go to her bank, or their

9     bank and get the information.  It shouldn't take until

10    September or October to get that.

11         MS. TIRELLI:  Your Honor, we'll do the best we

12    can.  I'll ask my client.  I don't know if she still uses

13    the same bank that she used back in 2005.  I'm just saying

14    60 days I don't think is asking a lot.  But I mean, how much

15    time does Your Honor want to give us?

16         THE COURT:  Well, this case continues to erode the

17    benefits of bankruptcy to creditors because it's -- the

18    administered expenses are rolling along and I'm going to

19    stop that.  So what I want to do is get to the issues that

20    are going to be about the policy that bankruptcy is supposed

21    to address.  The creditors are supposed to be able to get

22    paid efficiently and quickly in Chapter 13.  The plan is

23    supposed to be filed with the petition, or 15 days

24    thereafter.  That's how fast things go in Chapter 13.

25         This case is a -- what is this case?  This case is

44

1    at least a year old.  I'm trying to move this along.

2              I'm going to have the hearing on August 15th.  And

3    the information, the affidavit that I required and I'm

4    ordering today, should be delivered to the U.S. Trustee and

5    to the bank and to chambers -- that is the date I'm giving

6    you is the delivery date -- is August -- let's see how this

7    works.  August 1.  If your client doesn't -- her records

8    were burned up, you ought to be able to find out about that

9    by this evening.

10             If she -- that's a way of saying she should be

11   able to find out whether she has records or she doesn't have

12   records within a very short period of time.  If she doesn't

13   have -- she ought to be able to remember who her bank was.

14             And if then she, through you, makes a request for

15   her bank records which will show the payments, then I think

16   the August 1 ought to work.  That's without prejudice to you

17   asking for more time and which you'll get for cause.  But I

18   believe that we ought to be able to get this hearing on the

19   15th.

20             Now that will put the Court in a position to have

21   a hearing on who -- on the amount of the debt; the amount of

22   the secured debt.  Once the amount of the secured debt has

23   been determined, then the question is going to be what

24   happens to this case.  There are a number possibilities.

25             The case can be -- proof of claim can be

1    withdrawn. A payment could be made to anyone who has an

2    arguable claim to it in exchange for a full release.  This

3    case could be converted to Chapter 7, because there's

4    nothing here that would suggest that it should be a Chapter

5    13, at least not at this point in time.

6           Chapter 13 isn't a program designed to protect the

7    insurance proceeds.  But particularly when all of those

8    proceeds have to be paid out to the holder of a secured

9    claim, and if there's any equity over that, the dollar

10   amount can be distributed to creditors either through 13 or

11   seven.  But we're getting way ahead of ourselves.

12          I think what I need to know first is the amount of

13   the debt; the amount of the secured debt.  So the Court will

14   get that information, as will everyone else here.  MAC ought

15   to be put on notice of this.  Anybody else ought to be put

16   on notice of this?

17          MS. TIRELLI:  Your Honor, I would suggest that all

18   of the parties that are named to the pooling and servicing

19   agreement ought to be put on notice.

20          THE COURT:  All right.  I'm giving them all

21   notice.

22          MS. TIRELLI:  Okay.  Thank you.

23          THE COURT:  And the notice and I'm going to ask

24   the bank to prepare a scheduling an order.  It's effective

25   today.  I'll enter it today, or I'll enter it as soon as I

1    get it.

2              Now, Mr. Connop, you were going to say something?

3              MR. CONNOP:  Oh.  Your Honor, it appeared to me

4    with MAC, Option One, or Sand Canyon as it's known, Deutsche

5    Bank, obviously AMSI's aware of the situation, should take

6    care of the interest.

7              THE COURT:  If somebody gets notice and they'll

8    say, what is this, and they'll throw it into the waste

9    basket, that's okay.

10             MR. CONNOP:  Thank you.

11             THE COURT:  I'd rather give more notice than less.

12             MR. CONNOP:  We'll take care of it.

13             MS. CLAIBORN:  Your Honor, you did start to

14   mention at some point the U.S. Trustee's motion for the 2004

15   Exam and I wasn't quite clear where the Court was headed

16   with that.

17             THE COURT:  Oh, I said the protective order is --

18   I said that the request for a protective order, all of that

19   would go off.  Perhaps you're correct in this observation.

20             The discovery is going to go -- all discovery on

21   the issue of this debt, with the exception of anything I

22   just said about the order, that is -- I don't want any more

23   administrative expense spent.

24             I don't want any more money coming out of this

25   estate than is necessary for this estate to address any case

1    or controversy that is left here.

2              To that extent I suppose I could word it this way;

3    both motions for protective order are granted without

4    prejudice to reconsideration, if necessary.  That would be

5    an appropriate way to do it.

6              The gist of what I'm doing is to stop the

7    bleeding, the hemorrhaging of money at the expense of the

8    estate for a matter which the record now demonstrates is

9    unnecessary for the benefit of the estate.

10             So we'll see how this evolves.  Anything else?

11             MR. CONNOP:  The hearing on the 15th, Your Honor,

12   that's at 2:00?

13             THE COURT:  Hearing on the 15th -- I'll tell you

14   what I think I'm going to do.  I'm not going to -- the 15th

15   is not going to be a good day.  I'll make it the 16th at

16   2:00.

17             MR. CONNOP:  Yes, Your Honor.  Thank you.

18             THE COURT:  The banks needs to -- an opportunity

19   to respond.  I'm going to make that the 7th and I'm going to

20   make that the 8th.  The 7th is a Sunday.  So the 8th.

21             The initial papers by the debtor on the 1st of

22   August.  The response, directed paragraph by paragraph, so

23   you're directly answering the claims made by the debtor.

24             And as far as the appraisal, you're required as

25   you have agreed to do, to serve the debtor's counsel with a

48

1    copy of your appraisal.

2              MR. CONNOP:  Very well, Your Honor.

3              THE COURT:  I think that covers it.  I overlooked

4    that.

5              MS. CROOG:  One more thing, Your Honor.

6              THE COURT:  Yes, ma'am?

7              MS. CROOG:  Your Honor, would it be useful for us

8    to obtain an appraisal of the current value of the property

9    in its current condition?

10             THE COURT:  I thought it was -- your colleague

11   said it burned to the ground.

12             MR. CONNOP:  Well, there --

13             MS. CROOG:  There's a shell left, I believe, Your

14   Honor.

15             MR. CONNOP:  I think to take into account the

16   value of the --

17             MS. CROOG:  The current value of the lot.

18             MR. CONNOP:  May we consider obtaining our own

19   appraisal?

20             THE COURT:  You could get what -- yes, you need to

21   get a -- I need to know what --

22             MR. CONNOP:  It's a year old.  Right.

23             THE COURT:  -- it was worth at the time of the

24   filing so I could see whether or not interest would continue

25   to run.

1          MR. CONNOP:  We understand.

2          THE COURT:  If you're out of equity, you're out of

3     interest payments.  It may be that with insurance proceeds,

4     which ought to be a number that could be determined, we now

5     know that this house that used to be bricks and mortar are

6     now dollars and pennies.

7          Anything else?

8          MR. CONNOP:  Not here, Your Honor.

9          THE COURT:  Ms. Tirelli?  Anything else?

10         MS. TIRELLI:  No, Your Honor.  Nothing further.

11         THE COURT:  All right.  Then Court is adjourned.

12         MR. CONNOP:  Thank you, Your Honor.

13         MS. TIRELLI:  Thank you, Your Honor.

14         MS. CLAIBORN:  Thank you, Your Honor.

15      (Proceedings concluded at 3:50 p.m.)

16      I, CHRISTINE FIORE, Certified Electronic Reporter and

17    Transcriber, certify that the foregoing is a correct

18    transcript from the official electronic sound recording of

19    the proceedings in the above-entitled matter.

20

21    *Christine Fiore*

22    _____July 1, 2011

23    Christine Fiore, CERT*D-410

24

25